```
 1                  UNITED STATES DISTRICT COURT

 2                  FOR THE DISTRICT OF DELAWARE

 3

 4    PRICEPLAY.COM INC.,          :   CA NO. 14-92-RGA

 5                                 :   October 27, 2014

 6              Plaintiff,         :

 7                                 :   3:03 o'clock p.m.

 8         v.                      :

 9                                 :

10    AOL ADVERTISING, INC.,       :

11                                 :

12              Defendant,         :

13    ............................:

14

15

16                  TRANSCRIPT OF MOTION TO DISMISS

17            BEFORE THE HONORABLE RICHARD G. ANDREWS

18                 UNITED STATES DISTRICT JUDGE

19

20

21    APPEARANCES:

22

23    For Plaintiff:     BAYARD, P.A.

24                       BY:  STEPHEN A. BRAUERMAN, ESQ

25                               -and-
```

```
 1                              WESTERMAN HATTORI DANIELS & ADRIAN

 2                              BY:  SCOTT M. DANIELS, ESQ

 3                              BY:  DARRIN A. AUITO, ESQ

 4

 5

 6      For Defendant:         POTTER, ANDERSON & CORROON

 7                              BY:  DAVID E. MOORE, ESQ

 8                                      -and-

 9                              COVINGTON & BURLING

10                              BY:  PETER A. SWANSON, ESQ

11                              BY:  SANGJOON HAN, ESQ

12

13      Also Present:          Chellis Gonzalez, Esq

14                              In House Counsel for AOL

15

16

17

18

19

20      Court Reporter:         LEONARD A. DIBBS

21                              Official Court Reporter

22

23

24

25
```

1                   P R O C E E D I N G S

2

3              (The proceedings occurred at 3:02 o'clock p.m. as

4     follows:)

5              THE COURT:  All right.

6              Good afternoon.  Please be seated.

7              Hold on a minute.

8              All right.

9              Mr. Brauerman, who do you have with you?

10             MR. BRAUERMAN:  Good afternoon, your Honor.

11             Steve Brauerman from Bayard.

12             I'm joined at counsel table by Scott Daniels and Darrin

13    Auito from Westerman Hattori Daniels & Adrian in Washington,

14    D.C.

15             With your Honor's permission, Mr. Daniels will be

16    addressing the Court this afternoon.

17             THE COURT:  Good afternoon.

18             Mr. Moore?

19             MR. MOORE:  Good afternoon, your Honor.

20             Dave Moore from Potter, Anderson & Corroon on behalf of

21    AOL Advertising, Inc.

22             Sitting at counsel table with me is from Covington &

23    Burling Peter Swanson and Songjoon Han, also from AOL Chellis

24    Gonzalez.

25             THE COURT:  All right.

1          Good afternoon to you all, too.

2          All right.

3          So, it's AOL's argument here.

4          Mr. Swanson, I presume?

5          MR. SWANSON:  Yes, your Honor.

6          May it please the Court, Peter Swanson on behalf of AOL

7     Advertising.

8          Your Honor, this case falls squarely within <u>Alice</u> and

9     other Sections of the 101 precedents, because the asserted

10    patents are directed an abstract idea, and the claims do no more

11    than apply that idea to a generic computer.

12         Plaintiff has not offered any credible reason for

13    distinguishing this case from <u>Alice</u> or any other Section 101

14    case, and plaintiff has not offered any proposed claim

15    construction that would supply any inventive concept.

16         THE COURT:  So, just to make sure I have the background

17    right --

18         MR. SWANSON:  Sure.

19         THE COURT:  -- I saw a talk that there are five

20    asserted claims in the Complaint.  I guess five independent

21    claims.  And then I saw some discussion in the briefing about

22    dependent claims.

23         What claims are actually asserted?

24         MR. SWANSON:  I think we probably would have to ask

25    plaintiff about which claims are actually asserted.

1          THE COURT:  Okay.

2          Let me just ask plaintiff while we're here, which ones

3     are asserted?

4          MR. DANIELS:  I'm afraid I don't remember, your Honor,

5     but the independent claims are asserted.

6          THE COURT:  Right.  I got that.

7          MR. DANIELS:  Each of the dependent claims that we've

8     mentioned in our brief is also asserted.

9          THE COURT:  Okay.  All right.

10         Well, that's fine.

11         MR. DANIELS:  Okay.

12         THE COURT:  And, in terms of the constructions that the

13    plaintiff sent in, do any of them, do you think, affect your

14    argument one way or the other?

15         MR. SWANSON:  Not at all, your Honor.

16         THE COURT:  All right.

17         So hold that thought.

18         THE COURT:  Mr. Daniels, do you think the constructions

19    you sent in affect the arguments at all one way or the other?

20         MR. DANIELS:  We don't think that the constructions do,

21    but the terms, themselves, do.

22         THE COURT:  Okay.

23         MR. DANIELS:  For instance --

24         THE COURT:  That's fair enough.  It sort cuts out an

25    issue that, if I'm not really too concerned about what the

1    constructions are.  I mean it seemed to me it didn't look like

2    the constructions were widely different than sort of what one

3    might understand from these things.

4           MR. DANIELS:  Yes, your Honor.

5           We think that their -- the constructions -- the

6    understanding that one skilled in the art would have about the

7    common and ordinary meaning of those terms.

8           But since lawyers are what they are, we thought the

9    best thing would be to --

10           THE COURT:  No, no, and I appreciate that.  I haven't

11    been able to actually do it.  I'm just saying that it doesn't

12    make any difference.

13           I think your answer is, no, but the underlying terms

14    are significant.

15           MR. DANIELS:  Correct, your Honor.

16           THE COURT:  Okay.  Go ahead, Mr. Swanson.

17           MR. SWANSON:  Sure.  Thank you, your Honor.

18           So I guess with that introduction in mind, I plan to

19    focus on three main points.

20           THE COURT:  Okay.

21           MR. SWANSON:  First I'll explain what the abstract idea

22    is and why there is no inventive concept.

23           Second, I'll briefly discuss the plaintiff's

24    formulation of the abstract idea of fundamental concept, which

25    we disagree with, but it doesn't alter the conclusions that the

1    claims are unpatentable.

2            And, third, I going to address the plaintiff's proposed

3    claim construction, but I actually might --

4            THE COURT:  Do you see how I got through that argument?

5            MR. SWANSON:  You streamlined it.

6            THE COURT:  All right.

7            Before you do that, let me just see, because the one

8    thing that I try to do is to understand what the claims of the

9    patent actually seem to be asserting.

10           So, if you imagine -- and I only say this because I

11   have some vague familiarity with how this works -- if e-Bay was

12   putting up an item for sale, and it said that, you know, the

13   item's on bid for 24 hours, and then whatever the winning bid

14   is, we'll let you draw a card, and if it's black, you'll get ten

15   percent knocked off, and if it is red, then you pay what you

16   bid.

17           Would that be covered by the asserted claims of the

18   patent?

19           MR. SWANSON:  I would have to look at the claim

20   language more closely to see if that is the exact example with

21   all of the claims.  I think that's the gist of it is that you

22   have some activity, such as drawing cards, beyond the mere

23   bidding an auction or the purchase of a product itself, and that

24   has -- that activity has the potential to lower the price of the

25   product.

1          THE COURT:  Okay.  All right.

2          You said at one point in your briefing that the idea

3    here is the abstract idea, and maybe an old idea, because Babe

4    Ruth resolved this contract issue by what I assume, or what I

5    saw you described as flipping a coin, presumably with management

6    have one price if they won, and Babe Ruth having one price one

7    price if he won?

8          MR. SWANSON:  Right.

9          THE COURT:  Do you have any similar stories

10   about something, because that doesn't seem to be -- I mean at

11   one level that seems to be, I guess you could say, a price

12   calculation where there's a game of chance thrown in to resolve

13   something where the parties agree they are going to have a

14   transaction, they just don't know what the price is going to be.

15         Do you think that's different than having a live

16   auction and then having some game of chance at the end of it?

17         MR. SWANSON:  I don't see any meaningful distinction.

18   The plaintiff, in the opposition, points out that at least in

19   some of the claims there has to be a binding commitment.  That's

20   exactly what, I think, happened with Babe Ruth.

21         If he and the owners entered into this binding

22   agreement, was it known that they were going to consummate a

23   contract?

24         THE COURT:  Well, presumably, there are a lot of

25   auctions where if you bid, that's a binding commitment.

1          If you are the high bidder you're going to pay that

2     price, right?

3          MR. SWANSON:  I think all auctions are premised on that

4     observation.

5          THE COURT:  How about a million dollars?  How about

6     $500,000?

7          MR. SWANSON:  Exactly.

8          I mean another example -- I mean if we look at the

9     auction more of a field of use, you could do the same concept

10    outside of an auction, and it would work the same way.

11          To us that's really the abstract idea is, the notion

12    that in any sort of sales transaction, you engaged in some

13    additional activity with the possibility of lowering the price

14    of the piece.

15          THE COURT:  Yes, but this is a fairly specific

16    additional activity.  You know, it's not like, okay, if you buy

17    the car, I will sell you the floor mats at half off.

18          I mean it does seem to be that a part of this is, okay,

19    we agree to have a deal, and based on some event, the outcome of

20    which is not yet known, then the price may be altered.

21          MR. SWANSON:  Yes, but I think the Babe Ruth example

22    fits that.  I think another example is restaurants for ages, or

23    certain restaurants at least have offered deals where a diner

24    can -- if the diner finishes his or her meal within a certain

25    amount of time, the diner gets for free some discounted price.

1    For instance, maybe it's a 72-ounce steak.

2         There's a famous steakhouse down in Texas, that says,

3    if you can finish our 72-ounce steak in less than an hour, your

4    meal is on the house.

5         And there you've got a binding commitment that you're

6    going to -- you're going to buy the meal, or the product, and

7    then based on the this additional activity eating, you either

8    pay full price, if you can't finish --

9         THE COURT:  So that's the reason why you brought up the

10   Babe Ruth thing is, because what you're thinking is, the auction

11   is, essentially, just a way of getting to a contract?

12        MR. SWANSON:  Yes.  Exactly.

13        THE COURT:  Babe Ruth, they have a contract.  It's a

14   question of price.  It's an auction.  You know, during the -- if

15   you are the winning bidder, you have a price, okay.  I guess I

16   kind of see that.

17        MR. SWANSON:  I think the patents, themselves, just

18   describe an auction as one application or one example of this.

19        I think the summary of the invention makes clear that

20   it's really the more basic idea that, hey, we can attract more

21   buyers if we give them the opportunity to lower the price

22   through this additional activity.

23        THE COURT:  It seemed to me, though, I have not,

24   obviously, read it closely, that the idea was -- which I guess

25   applies to auctions, too, but that the seller understanding what

1    the games of chance are being, essentially, build that into the

2    selling price.  And, so, the seller may lose on any particular

3    transaction over time would, presumably, do just as well, or

4    even better I guess, than if they had a fixed price, because the

5    participation in this games of chance or games of skill,

6    whatever, is a way to actually increase the amount of business?

7           MR. SWANSON:  Yes.  The patents don't say much about

8    the economic theory behind this.  The patents seem to described

9    this more as a marketing gimmick.

10           Column 2, Line 66.  After describing this idea it says

11    the sellers are able to attract buyers using the marketing

12    incentive that buyers can reduce the price of the offered

13    product or service by performing well in the specified activity.

14           So it seems like a way to get more buyers in the door.

15    And in that regard, I think this is quite a simple and

16    well-understood familiar idea.  That if you offer discounts,

17    that's a way of attracting more buyers.  On that level it's -- I

18    think it's even a simpler formulation of the abstract idea.

19           THE COURT:  I think the most discounts are things that

20    are part of the bargaining process, as opposed to done after the

21    bargaining, because one consequence of this particular method,

22    or whatever it is exactly is, if you bid a thousand dollars, you

23    have to pay a thousand dollars.

24           MR. SWANSON:  Yes.  It's a more specific way of

25    offering a discount, one particular way of offering a discount.

1    I think that's how we would look at it.

2         THE COURT:  Okay.  So I've kind of -- why don't you

3    give me your argument.

4         MR. SWANSON:  Well, so, we've been talking about the

5    abstract idea.  This price determination, price reduction

6    concept, and we think this idea has all of the characteristics

7    of an unpatentable abstract idea.

8         THE COURT:  And, actually, just -- you may have this in

9    your brief somewhere -- but, you know, the Supreme Court, maybe

10   even the Federal Circuit, have this nit-picking little way of

11   putting abstract ideas and giving it some characterization.

12        What is the pithiest formulation of the abstract idea

13   that you say is here that you've come up?

14        MR. SWANSON:  The pithiest?

15        THE COURT:  You don't have to take that literally.

16        MR. SWANSON:  I think, Judge, a pithy way of putting it

17   would be that the patents are, I think, they really are just

18   based on this fundamental principle of offering buyers a

19   discounted price.

20        If you want to be a little more specific or precise,

21   it's a sales transaction whereby the buyer has the opportunity

22   to reduce the price of the product by a participation in an

23   additional activity.

24        THE COURT:  It sales, a sales transaction where the

25   buyer -- because I think more precise is probably better here.

1    In fact, I'm kind of thinking that's what the Supreme Court has

2    told us to do.  Sales transaction where the buyer has an

3    opportunity to reduce the price by additional activity.

4              MR. SWANSON:  Correct.

5              THE COURT:  Something like that?

6              MR. SWANSON:  Yes.

7              THE COURT:  All right.  Go ahead.

8              MR. SWANSON:  So that concept, that price

9    determination, or price reduction concept, has all the

10   characteristics of an unpatentable abstract idea in the case

11   law.

12             First, it is a fundamental notion about human behavior,

13   that the idea that you could get more buyers to your store, or

14   your site, by offering them the opportunity to lower the price

15   of the product.

16             It's a familiar old idea.  We talked about the Babe

17   Ruth example.  The restaurant example that I mentioned.

18             It's not a very complicated idea, especially compared

19   to some of these other cases, hedging, intermediate settlements,

20   transaction performance guarantees, and the buySAFE case.

21             Third, this concept, this idea can be performed

22   mentally.  It's a mental process.  Numerous cases going back to

23   Golf Shock v. Benson  have held that you can't patent a purely

24   mental process.

25             And another case I'll just mention on that score is In

1    Re:  Schrader, 22F.3d 290, which is a Federal Circuit case in

2    which they held that a claim on a specific method of conducting

3    auctions was an unpatentable algorithm or mental process.  And

4    the Court there noted that that algorithm, as applied to the

5    auction, was really just based on some basic principles about

6    human behavior and how buyers and sellers act in the course of

7    an auction.  We think that applies equally in this case.

8          Fourth is a commercial or financial arrangement, much

9    like many of the recent cases; Alice, Bilski, and buySAFE.

10          And another case I'll mention is OIP Technologies v.

11   Amazon.  This was a case before Alice decided by the Northern

12   District of California involving a patent on a specific

13   technique for price optimization as used in e-commerce.

14          And by price optimization, the idea was trying to

15   figure out the right price at which to offer a product to a

16   consumer.  And the District Court in that case had no trouble

17   concluding that that was an unpatentable abstract idea, and the

18   Court went on to hold the patent invalid.

19          In short, the price determination, or reduction concept

20   of the Asserted Patents, is indistinguishable for 101 purposes,

21   from Alice, Bilski, and all these other recent cases, and even

22   older cases.  And I've not seen plaintiff offering any good

23   reason for distinguishing that concept from the unpatentable

24   abstract ideas in those cases.

25          So moving to the second step of the Alice test, the

1    inventive concept, there is no inventive concept here, because

2    the claims merely apply this price determination idea to a

3    generic computer.

4           It bears mention, I think, that the claims here are

5    pretty short.  They're aren't too many limitations to them.

6           But looking at the individual claim limitations to the

7    extent that a computer is required at all, it's just a

8    conventional routine, well known use of a computer.

9           THE COURT:  I mean certainly some aspects of this seem

10   like the computer doesn't add a lot, right?

11          MR. SWANSON:  We would agree with that.  We would agree

12   that it doesn't add anything.  You could take out the references

13   to computers and do this entirely in your head or on pen and

14   paper.

15          THE COURT:  I guess -- I mean this would be -- would

16   this be roughly the equivalent of -- let's say you were a well

17   known hamburger chain, and you said, you know, the one millionth

18   burger is free.

19          Does everybody enter into a game of chance to get that

20   one millionth burger?

21          MR. SWANSON:  Yes.  I think that might be -- I think

22   that's the same idea that you've agreed to buy a product, and

23   this activity is sort of a game of chance, that might ultimately

24   lead to reducing the price of that product.

25          THE COURT:  Well, of course, I guess the problem with

1    that is, the odds are so small, you would need something -- I'm

2    trying to think -- but the title or the phrases used in some of

3    this is "price optimization."

4           Actually, I guess that is what you were saying was used

5    in OIP v. Amazon?

6           MR. SWANSON:  Correct.  Price determination.

7           THE COURT:  Price determination, yes, okay.

8           MR. SWANSON:  I think that phrase appears in the

9    patents.

10          THE COURT:  Tell me about the second step.

11          MR. SWANSON:  Sure.  Again, looking at the individual

12   limitations, to the extent that a computer is required, it's a

13   conventional routine, well known use of a computer, and looking

14   at the claim as a whole, there is no inventive concept there

15   either.

16          Just like in Alice, this patent isn't about an

17   improvement in computing technology or e-commerce technology.

18   This is about an abstract business solution to an abstract

19   business problem that's merely applied to computers.

20          THE COURT:  And it is business problem you would

21   describe as getting more customers in the door?

22          MR. SWANSON:  I think that's accurate, your Honor.

23          I think plaintiff's counsel at the October 15th hearing

24   on the Motion to Transfer venue said that the patents were about

25   a way to promote sales.  I think that's how they view the

1    patents as well.

2         THE COURT:  It kind of -- I mean that seems -- and I'll

3    hear from Mr. Daniels soon -- but that seem likes a reasonable

4    -- I mean, because after all, I guess that's why you have most

5    business methods is to try to increase profits in one fashion or

6    another.

7         So, yes, I think that's probably right.

8         MR. SWANSON:  Looking at plaintiff's opposition, they

9    don't seem dispute that the computer limitations do not provide

10   inventive concepts, with one exception.  They make a conclusory

11   assertion that the calculation of a price using an algorithm is

12   somehow not compensable.

13        THE COURT:  The algorithms, they are not actually

14   disclosed in the specification, right?

15        MR. SWANSON:  There is no algorithm disclosed in the

16   specification.

17        THE COURT:  At least from what I could gather from

18   examples in the briefing, I mean algorithms are pretty simple.

19   In fact, part of the reason why they don't need to be described

20   in the specification is, they could be really whatever seller

21   wants to make them to be.  You get two out of three games right,

22   you get 5 percent off, you get ten cents, or whatever.

23        And, so, that algorithm is not really a whole lot

24   different than just a mathematical formula here, right?

25        MR. SWANSON:  That's exactly, right, your Honor.

1        The one example in the specification I think is right

2    on point.  On the bottom of Column 6, and the top of Column 7 of

3    the '982 patent, which I think was Exhibit A to the Complaint,

4    they discuss an example of a Mark McGuire baseball card that was

5    offered.

6        THE COURT:  I saw that.

7        MR. SWANSON:  It's offered for $600, but if the buyer

8    answers nine out of ten trivia questions correctly, then the

9    buyer can obtain the card for $500, and I would submit that

10   doesn't require a computer at all to do that calculation.  That

11   can be done on a pad or pen or paper, so --

12       THE COURT:  There are two parts to this test.  I'm

13   trying to figure out what is an abstract idea or not.

14       You know, I'm not sure -- sometimes I wonder how much

15   help the formulations of the Supreme Court and Federal Circuit

16   are, gives more precedence, which is the way you're arguing

17   this, here is something that you previously said was abstract,

18   presumably, Mr. Daniels, here's something that was not abstract,

19   where does it fit in relation to those things?

20       But in terms of whether or not the computer adds

21   something here, I think that seems to me, it's hard for me to

22   figure out what a computer does add, if anything.  And

23   certainly, you know, figuring out the amount of the discounts or

24   reduction, that is the kind of thing that people do in their

25   heads every day.  It's hard to believe that that's anything.

1          MR. SWANSON:  That's correct, your Honor.

2          I think OIP Technologies is talking about the price

3     optimization in that case, so that was a mental process that,

4     you know, that only required a generic computer, not any special

5     machine, or special algorithm to do.

6          I would also just note on that point, that plaintiff

7     didn't offer any proposed claim construction for algorithm or

8     the calculating limitation, so --

9          THE COURT:  Yes.

10         MR. SWANSON:  -- as it applies to any method of

11    calculating it based on any algorithm.

12         THE COURT:  All right.

13         Are you about done?

14         MR. SWANSON:  Yes, your Honor.

15         I was going to address the plaintiff's formulation of

16    the -- what they call the fundamental concept or abstract idea,

17    if you'd like?

18         THE COURT:  Well, let's spend two minutes on it, then

19    I'm going to take a break, because I have a jury that has sent

20    some note, and I need to read what the note is.

21         MR. SWANSON:  Just briefly, the plaintiff, in its

22    opposition, says the fundamental concept of the asserter patents

23    is the performance of a sales transaction, any sales transaction

24    over the internet.

25         We disagree with that formulation, but we don't think

1    it makes a difference.

2         THE COURT:  Well, actually, that seems like -- that

3    seem like more of an abstract idea.

4         I mean sales transaction?

5         MR. SWANSON:  I think that, presumably, they

6    characterized it very broadly in order to argue that the claims

7    at issue are narrower than that, and, therefore, inventive.

8         THE COURT:  Well, they are narrower than that, but I

9    mean I think that's part of the reason why I'm curious as to

10    what your view of abstract idea is.

11         Because I think if you say, well, the abstract idea is

12    the sales transaction, or even a sales transaction over the

13    internet, that's -- that is -- well, the sales transaction,

14    that's even older than anything the Supreme Court has cited in

15    any of its cases.

16         MR. SWANSON:  I would agree.

17         By narrowing to that a particular type of sales

18    transaction claims, they have haven't done anything inventive,

19    because all they would have done is --

20         THE COURT:  Well, that's the reason why it seems to me

21    that the narrowing, I would think -- maybe I'm wrong -- but I

22    would think that you want to narrow it, so that the abstract

23    idea becomes -- I don't know -- it seems to me the broader you

24    make it, the more it's an abstract idea.  The more you narrow

25    it, the chances are that it's something else.

1          But then that also gets to the difficulty that I'm

2     never really sure.  I haven't been sure exactly what it is that

3     the Supreme Court -- you know, sometimes they talk about

4     abstract idea in terms of age, but you would think that age is

5     more of a obviousness kind of concern than an abstract idea.

6          But there seems to be, I guess, some undercurrent that

7     if it's old enough -- I mean besides from being old, that it's

8     -- that it's a abstract idea.  I mean it could be abstract ideas

9     that were being created yesterday.

10          It does seem that the way that the source code, and

11     Federal Circuit formulate these things, that when they find

12     something invalid as unpatentable, they tend to give it a

13     broader rather than a narrower reading.

14          MR. SWANSON:  Uh-huh.  I think your Honor is right that

15     some of the cases do refer to the age, or something being a

16     longstanding principle, or ancient principle.

17          But the holding of Parker v. Flook, it's a Supreme

18     Court decision from 1978, was that the novelty of the law of

19     nature, an abstract idea, is not germane to the 101 analysis.

20          THE COURT:  Yes, but that seems to be maybe being

21     eroded a bit, because, after all, they do reference it, and you

22     kind of wonder why are they referencing it, unless it has some

23     point.

24          All right.

25          Listen, I hate to do this, but I will give you your

1   chance, Mr. Daniels.

2           We'll take a recess.  I expect these other lawyers will

3   be here shortly.  If you do see a bunch of lawyers walking in,

4   if you don't mind stepping away for a minute, because I've got

5   to deal with them.

6           Let me see what the note is.  It might not require

7   anything on any part.

8           I'll be right back.

9           (A recess was taken at this time.)

10          (Court resumed after a recess.)

11          THE COURT:  Sorry.  Normally, I like to be in touch

12  with my staff.  When I get notes frequently that tell me this,

13  we recently got our computers got upgraded, I have to click to

14  something that I could actually get a message.

15          So hold on a second.

16          (Pause)

17          All right.

18          Mr. Daniels?

19          MR. DANIELS:  Thank you, your Honor.

20          THE COURT:  Good to see you again.

21          MR. DANIELS:  Thank you, your Honor.

22          Nice to see you as well.

23          MR. DANIELS:  May I approach the bench with a handout?

24          THE COURT:  Sure.  There are a lot of handouts here,

25  but they're all the same thing.

 1          MR. DANIELS:  Yes, your Honor.  There are three copies

 2     that I passed up.

 3          THE COURT:  All right.

 4          Go ahead.

 5          MR. DANIELS:  I followed these 101 cases over the last

 6     several years, and it seems to me that there's a pattern to

 7     them.  That they can't distinguish between two types of patent

 8     claims.

 9          There's the one type of patent claim that is

10     ineligible, where you start with a fundamental concept, and then

11     you take characteristics of that concept, and tack them on to

12     the claim, and you get a very long claim, but it's nothing more

13     in the end than just the concept itself.

14          The other type of claim, though, also begins with a

15     fundamental concept, but it adds something to it, and the holds

16     that second idea into the fundamental concept.  It adds another

17     concept, another, and keeps modifying, fully integrating until

18     you really do have something that's useful and novel, and I

19     think that's what we have in our case.

20          If you look at the first page --

21          THE COURT:  Well, the 101 is not necessarily

22     inconsistent with something being useful or novel, is it?

23          MR. DANIELS:  No.  In fact, that's what it requires.

24          THE COURT:  No, no, but something could be unpatentable

25     and yet still be useful and novel, right?

1          MR. DANIELS:  Yes.  But I think, in our case, it is --

2          THE COURT:  Right, right.  I'm just talking in the

3    abstract here.

4          MR. DANIELS:  I understand.

5          And we'll get to the Alice standard and apply it to our

6    particular claim.

7          And the first page of our handout is a reprint of the

8    first claim of the first patent that we think is representative

9    of all the claims that we have asserted.

10         THE COURT:  And one of things that I got from your

11   briefing, I think, was that one of the patents -- the two

12   patents, while they deal with the same general topic, you're

13   looking at them slightly differently, right?

14         MR. DANIELS:  Well, the first one is a little more

15   specific in the main claims.

16         THE COURT:  And that's the '982.

17         MR. DANIELS:  The '982 is our first patent, and we want

18   to focus our arguments on the first claim of the first patent.

19         THE COURT:  And I know you said it here it's

20   representative.

21         Do you draw any distinction, in your own mind, between

22   the arguments that are made on behalf of the one patent as

23   opposed to the other?

24         Or asked differently, are you on better grounds on the

25   '982 patent than on the other one?

1          MR. DANIELS:  Yes, we are.

2          THE COURT:  Okay.

3          MR. DANIELS:  And it involves the expression

4   "associated with," and I think that will became clear over the

5   course of this argument.

6          THE COURT:  That's the one that I think is, if you are

7   -- have won an auction, or won some kind of contract, the game

8   has to somehow relate to the subject matter of the one you won

9   the auction about?

10          MR. DANIELS:  That's right.  If you look at Column 6,

11   the discussion of the Mark McGuire card, there are four

12   different competitive activities that are mentioned.

13          One is a trivia quiz about Mark McGuire.  That would be

14   associated with.

15          The other is to guess who the first player to hit 50

16   home runs would be.

17          It's an old math, your Honor, so --

18          THE COURT:  Yes, yes, yes.

19          MR. DANIELS:  And that would be associated with the

20   Mark McGuire baseball card.

21          The keno game, I don't think so.

22          THE COURT:  And Pacman, probably not.

23          MR. DANIELS:  Probably not.

24          THE COURT:  Okay.  Right.

25          The associated with, okay.  Yes, I did see that in your

1    list of claim terms.

2         Go ahead.

3         MR. DANIELS:  Thank you, your Honor.

4         If you look at the first page, which has our Claim 1 of

5    the '892 patent, it talks about the participation and

6    competitive activity as a basis for setting the price, and it

7    also says that there is an auction here.

8         So we have the basic concept, perhaps, according to

9    AOL, of price selection based upon the buyer's participation in

10   a competitive activity.

11        But we've taken it a step further.  We've added an

12   auction to that.  And it is actually a different kind of auction

13   than what is normally contemplated.

14        Now, we have defined, auction, I believe, in our letter

15   to you as, essentially, a bidding where the high bidder walks

16   away with a price at that bidding price.

17        But the term "auction" is further qualified in our

18   claim, so that the auction result is taken into account in the

19   calculation of the price to be paid by the buyer.

20        So, it's certainly possible, that in our type of

21   auction, the winning bidder is not the one who walks away with

22   the price, the product of a particular price.

23        So, you know, we do have the concept of the competitive

24   activity.  We've combined it with an auction.  We've qualified

25   the kind of auction that exists.

1          Then toward the end of that limitation, we indicate the

2     competitive activity is associated with the product being

3     purchased.

4          And, so, that's exactly the situation that is disclosed

5     in the specification between the Mark McGuire card, and the

6     trivia contest, and the home run prediction.

7          There are other features to notice in this claim as

8     well.

9          For instance, the price -- well, the buyer is bound

10    before completion of the activity to make the purchase, so you

11    have, I think not just a basic concept, a fundamental concept

12    here, but you have all sorts of additional qualifications,

13    limitations, and they aren't just put into the claim.  The it is

14    not just a bag of components rattling together.  They all

15    interact with one another.

16         And the point of the interaction is to give the buyer a

17    certain sense of excitement that will bring the buyer through

18    the door, that will create a price that reflects competitive

19    bidding between potential buyers.

20         And it will result in a good experience, not just for

21    the buyer, but for the seller as well, because he will be able

22    to complete the sale of that product, because before the

23    competitive activity is completed, before the final price is

24    known, the buyer is bound to follow through with the

25    transaction.

1          So, this isn't just a simple Babe Ruth, flip the coin

2     story.  This is a complex interaction designed in the early days

3     of the internet, the early days of e-commerce, to give a

4     positive experience to the buyer, and a positive experience to

5     the seller, to improve commerce.

6          There is nothing unpatentable about business methods,

7     per se, and the statute, itself, at one point mentions business

8     method patents.

9          So, as you said earlier, the whole point of a business

10    method patent is to promote the profitability of the business

11    owner, to make sales better, and there's nothing abstract,

12    nothing patent ineligible about that.

13         THE COURT:  Well, so, I mean I do think that to some

14    extent -- maybe it tends to come in on the second part moreso

15    than the first -- but if you think about the source code saying

16    preempting activity of one kind or another, the narrower you

17    draw something, the less of a concern that is.

18         So I'm just curious, is there any -- so I think I can

19    actually picture between the Mark McGuire and something else,

20    what's being described here.

21         So, if, for example, AOL had an auction for Mark

22    McGuire cards, and the people were bidding at the same time

23    playing games, and the games carried some weight, so that what

24    seemed like the top bid might not actually be the top bid.

25         That would be the sort of thing that would be described

1    by this one limitation we're talking about?

2            MR. DANIELS:  Yes, your Honor.

3            And then the claim goes further with binding

4    commitment, and the requirement that the product be in some way

5    associated with the competitive activity.

6            THE COURT:  I'm sorry.  Yes, so the games that are

7    being played, while you're bidding on the Mark McGuire card, or,

8    you know, maybe not Mark McGuire names, but sort of baseball

9    games I mean associated with maybe -- I don't know -- they could

10   be sports games, but they're not flipping a coin, they're not

11   playing bridge, they're not -- I don't know -- random games of

12   chance.

13           MR. DANIELS:  That's right, your Honor.

14           And if you look at Slide 13 of our presentation, we

15   address this Babe Ruth story that we thought had very little to

16   do with our claimed invention.  It was submitted, perhaps, in

17   response to the Mark McGuire disclosure in our patent.

18           But it says that the base salary is determined by a

19   competitive activity, which we assume is the coin flip, and that

20   his salary is the price of the products put in our claim, so the

21   competitive activity has nothing to do with the Babe's

22   performance in the subsequent baseball season.

23           THE COURT:  Well, so, actually -- you know, I think

24   that has something to do with the abstract idea is here, or,

25   perhaps, there is no abstract idea.

1          So the defendant there said, because I do think the

2     Supreme Court said, one is supposed to seal down what the

3     abstract idea is behind the patent, if there is one, and says

4     that the sale transaction where the buyer has an opportunity to

5     reduce the price by an additional activity.

6          What do you think of that as being, unless I call it

7     abstract, just the idea of the patent claims, and do you think

8     that the idea of some or all of the patent claims?

9          MR. DANIELS:  No, your Honor.

10         We think that the idea, the abstract fundamental

11    concept is e-commerce, even though -- even if we accept AOL's

12    formulation of the fundamental concept as determining price

13    based upon competitive activity, we've gone far beyond that.

14         And, so, in the second step, we have so narrowed the

15    scope of the claim that there's no preemption problem.

16         THE COURT:  Well, no, no.  So that's the second step,

17    but your formulation of the fundamental concept is e-commerce?

18         MR. DANIELS:  Yes, your Honor.

19         We have an earlier slide.

20         THE COURT:  E-commerce is, essentially, just business

21    over the internet?

22         MR. DANIELS:  The sale of products over the internet,

23    yes, your Honor.

24         THE COURT:  Okay.

25         MR. DANIELS:  Our slide on this is No. 6.

1          THE COURT:  Okay.  So, actually, because I think

2     e-commerce -- I'm not sure I like that -- so would say a

3     different way of saying the fundamental concept is the sale of

4     products over the internet?

5          MR. DANIELS:  Correct, your Honor.

6          THE COURT:  Okay.

7          MR. DANIELS:  And you have to -- you know, e-commerce

8     is all around us now, but if you go back to when this patent was

9     filed, these were fairly new ideas.

10          On Slide 6 we have reproduced for you the fundamental

11     concepts identified in the other cases, Alice, Bankcorp, Bilski,

12     and so on.

13          And you have things like risk hedging in Bilski.

14     Dealer track as applying for credit.

15          So I would think of e-commerce as being on a comparable

16     level of abstraction.

17          THE COURT:  Well, I guess what I'm wondering is, isn't

18     Alice intermediary activity over the internet, and Bankcorp, or

19     Bilski risk-hedging over the internet?

20          I mean, so when you say the fundamental concept is sale

21     of products over the internet, isn't this sort of comparable to

22     the case law that you have under Slide 6, sale of products?

23          MR. DANIELS:  Yes.

24          THE COURT:  Okay.

25          MR. DANIELS:  Yes.  And I want to emphasize, though,

1    although we're saying that that is a fundamental concept, we're

2    really focusing on Step 2.

3          THE COURT:  Actually, I guess in a way, because I think

4    that's what you are focusing on, would you agree that the

5    fundamental concept here has to be, it is an abstract idea, so

6    it has to be transformed, or whatever the verb is that you want

7    to use, by Step 2 in order to be patentable?

8          MR. DANIELS:  As I understand Alice, it is the -- the

9    fundamental concept is first identified, and then it's asked,

10   has the patent claim added enough substantive limitations, so

11   that there is no longer a risk of preemption?

12         And I think it's important, in our case, that those

13   additional qualifications, those additional limitations, they're

14   not just recited as Step 1, Step 2 Step 3, and so on, but

15   they're integrated into one another.

16         THE COURT:  Well, no, no.  But, so, you know, in the

17   second we'll talk about that -- you've been talking about it

18   already -- but if you didn't have those things, then this is an

19   unpatentable abstract idea, right?

20         MR. DANIELS:  Correct, your Honor.

21         THE COURT:  Okay.  That's helpful to my understanding.

22         So let's talk about, for lack of a better word, the

23   transformation.

24         And, essentially, one of your points is, when you take

25   an independent claim in the '982 patent, or Claim 1, that all

1    the limitations, which are all worked in together, really

2    telescope, narrows the scope of the fundamental concept

3    severely, right?

4              MR. DANIELS:  Yes, your Honor.

5              THE COURT:  Okay.

6              MR. DANIELS:  And we have compiled on Slide 12 a list

7    of activities that are not covered by our claim, are not

8    preempted, and we've also included several -- three references

9    to the specification that identified certain types of activity

10   that are not intended to be covered.

11             And we've looked at your decision in Tuxis, and we saw

12   a similar approach taken by the plaintiffs there, and we have

13   looked at the detailed analysis that you went through to show

14   that these -- I think there were 12 other non-preemptive

15   activities that were mentioned by the plaintiff there -- and,

16   you know, carefully analyzed them to find that those were not

17   significant activities.

18             But here, I think these are significant activities.

19   You know, where you have a -- for instance, three, where the

20   price is not partially based on the auction, or four, where it

21   is not associated, the competitive activity is not associated

22   with the product being bought.

23             THE COURT:  So... and most of what you have on the

24   general concept here on page -- on your Slide 12 -- are things

25   -- I think these are things that you are arguing all apply to

1     the Claim 1 of the '982 patent, which I take it is really all we

2     are discussing here?

3          MR. DANIELS:  Correct.

4          THE COURT:  Since I have to go through this analysis

5     claim-by-claim, what are you suggesting I do with the rest of

6     your claims, if I agree with you on this analysis?

7          MR. DANIELS:  Well, I think you should take the same

8     approach to the independent claims of '917.

9          And we will concede that our case is not as strong with

10     respect to '917 as it is for '982.

11          But, I hope, again, the '917 you still have that same

12     interplay of the auction, and not just any auction, a particular

13     kind of auction.

14          THE COURT:  But one of the things is the associated

15     with is only in the '982 patent, right?

16          MR. DANIELS:  That's right, your Honor.

17          THE COURT:  And the associated with is what seems to me

18     without, perhaps, finding out what the exact scope of what

19     associated with means.

20          It seems to me greatly reduces the preemptive effect of

21     your patent.

22          MR. DANIELS:  That's correct, your Honor.

23          THE COURT:  All right.

24          I'm sorry.  Go ahead, Mr. Daniels.

25          MR. DANIELS:  If I could go back to the last slide, the

1   Babe Ruth slide.

2          THE COURT:  I'm sorry.  Which number was that?

3          MR. DANIELS:  6.

4          THE COURT:  6?

5          MR. DANIELS:  That is --

6          THE COURT:  No, that's the very last page I think.

7          MR. DANIELS:  -- 13.

8          THE COURT:  Yes.

9          MR. DANIELS:  This, I think, was AOL's attempt to show

10  that our claim is nothing more than an old idea.

11         And I was kind of surprised, because actually there are

12  three distinctions here to be made.

13         There's no auction in the Babe Ruth story, the price of

14  the product is not partially determined by an auction, and the

15  coin flip activity, if it is competitive, is not associated with

16  the product being purchased.

17         THE COURT:  Right.  The coin flip is definitely

18  different.

19         Your argument on Point No. 2, the price of the product

20  is not partially determined by an auction.

21         And, No. 1, there is no auction.

22         I take it, in No. 2, you're not just saying the auction

23  one over again.  You're saying -- you're drawing a distinction

24  between partially and fully determined?

25         MR. DANIELS:  Correct, your Honor.

1          THE COURT:  The way the patent is written, is it

2    something that if it only -- in order to meet the limitations it

3    has to be only partly determined, or is it something where if it

4    is partly determined, it requires something to be at least

5    partially determined?

6          MR. DANIELS:  I understand, your Honor, but it also

7    says that the price is at least partially determined by the

8    result of the competitive activity, so maybe the wording isn't

9    felicitous, but --

10         THE COURT:  Well, in other words, if something is at

11    least partially determined, then if it is fully determined, then

12    it meets the limitation, right?

13         MR. DANIELS:  I think in the context of this claim not.

14         THE COURT:  Okay.

15         MR. DANIELS:  Because there is also the limitation that

16    the price is at least partially determined by the participation

17    in the competitive activity.

18         THE COURT:  Okay.  Well, that would be a fair point, I

19    think.

20         Hold on a minute.

21         (Pause)

22         Well, certainly, if you are reading, which is not

23    unreasonable, it says, the product for a price that will be

24    partially based upon the buyer's participation at an auction,

25    and participation in a competitive activity, blah, blah, blah.

1          If you are reading the partially based to modify sort

2     of both of those, then I think, yes, you meet both of them, so

3     something that was entirely based on the auction would not meet

4     it?

5          MR. DANIELS:  Correct, your Honor.

6          Let me add that that's not unusual for patent claims.

7     That you often have a recitation of a certain requirement for a

8     patented invention.

9          And then later you have often a wherein clause of

10    limitation on that limitation itself.  Some sort of

11    qualification of the limitation, so that -- you were talking

12    about blue ice cream a moment ago.  You could have that

13    recitation, and the recitation has a certain breadth, and then a

14    subsequent limitation would narrow that scope.

15         So, in that instance, it could be where the blue ice

16    cream has a red stripe through it.

17         So, what I'm trying to say is that, that is, by no

18    means, uncommon in patent claims where one limitation further

19    qualifies an earlier limitation.

20         THE COURT:  Yes.  I haven't thought about that in

21    particular before.  It strikes me as what you say is at least

22    plausible and probably even right, you know, in my opinion.

23         So I think the Babe Ruth example has more weight in

24    relation to the weaker of the two patents in regards to this

25    issue, but I see your point, at least I think I see your point

1    on this particular claim.

2         All right.

3         What else would you like to tell me?

4         MR. DANIELS:  Your Honor, there were some hypotheticals

5    raised in the earlier presentation about drawing cards, being

6    the one millionth.

7         THE COURT:  Oh, yes, yes, for the hamburger.

8         MR. DANIELS:  I think those are similar to the Babe

9    Ruth story in that they don't include the auction.

10        THE COURT:  Right.  The reason why I thought they were

11    slightly more analogous, I was thinking of the auction as being

12    essentially a way to determine whose bid -- who you've got the

13    binding bid with.  It's kind of like going through the line and

14    purchasing the burger.  You know, how you get there, whether

15    it's through an auction, or through a -- you know, that's the

16    price they have listed.

17        But then the idea that after you've got a binding

18    commitment something was done that can lower the price, if it is

19    related to chance or -- don't some of these -- in fact, I kind

20    of remember going with my kids to McDonald's, and after you

21    bought it you're thinking, you got a card, and rub off some

22    stuff, and you got a free Coke, you get a free Coke.

23        It strikes me it's the same kind of -- you know, at a

24    certain level, it's the same kind of thing that the patent was

25    talking about in terms of things of chance, but it's not the

1    same thing as -- well, I guess even if it is associated with the

2    product, it has pictures of McDonald's products on it.

3           But, you know, I was thinking more about what is the

4    abstract idea, but it seems to me you've kind of move the

5    discussion to the second part, which, you know, which I can see

6    why you're doing it, do I take it that the -- the use of the

7    algorithm, the use of computers, neither of those things are

8    really what you're relying on here as add-ons that transform an

9    abstract idea into a patentable idea?

10          MR. DANIELS:  I think that we certainly want to rely on

11   what we said so far, and we don't want that to get lost in

12   arguments like we heard from AOL that the computer doesn't

13   count.

14          We think that's right.  The computer doesn't help in

15   this analysis.  But I'm just afraid that, you know -- you know,

16   the value of this invention just will be lost, because the word

17   "computer" appears in the claim.

18          It seems that in this some decisions that, you know,

19   you can't turn an unpatentable -- an ineligible invention into

20   something that is eligible by just tacking the word computer on

21   the claim.

22          By the same token, the use of the word "computer"

23   shouldn't be a poison Apple.

24          THE COURT:  Well, no, it doesn't subtract.

25          If you think of this as -- I mean let's say that it's a

1    combination of having a game that is associated with the

2    product, and having an auction, and having partially determined

3    by both things, maybe even having auctions going on where the

4    high bid is not necessarily the high bid.  Let's assume all that

5    is -- meets the threshold of being patentable -- well, then, I

6    guess we don't care about the computer -- let's assume it

7    doesn't meet the threshold of being patentable.

8           Having the computer isn't going do lift you above the

9    line, right?

10          MR. DANIELS:  Correct, your Honor.  That's correct.

11          Let me say this, though, about the internet.  And that

12    is that it is a way that makes this system practical in the real

13    world; that is, if you have this system used across the

14    internet, it will work, because of the mass of people that you

15    have who want to compete with one another on Mark McGuire

16    trivia, that want to pay $500 for a Mark McGuire card, that, on

17    the internet, you're going to get those people who are willing

18    to come together and make that competition, and make that bid

19    for the auction.

20          If you go down here to the square, to the Roderick

21    Square --

22          THE COURT:  Rodney.

23          MR. DANIELS:  -- to Rodney Square, and wait for people

24    to come by, wanting to compete for the Mark McGuire card, it's

25    just not going to work.

1          So I think that the limitations that we've talked

2     about, and relied upon here, are enough to make our claimed

3     invention patent eligible.

4          I think, in addition, if you take a real-world look at

5     this, the recitation of this being done over a network, adds to

6     the weight on the scale favoring that eligibility.

7          And I understand that that is not, you know, not a

8     popular view.  That the internet and computers get lumped

9     together and you just can't put the word "internet" on a claim

10    and transform something ineligible into something that's

11    eligible.  I think here, though, this thing would not really

12    work unless you have it being done over the internet.

13         And, so, what I want to say is that, our limitations

14    that we've talked about, and we've focused on, carry the day for

15    us.  And if they don't, I think you should take into account the

16    internet here, because, in this particular case, given how we

17    telescoped into this very precisely, the associated with and so

18    on, it is an integral part of our claimed invention.

19         THE COURT:  That's because the invention only works if

20    you have -- and I don't know how many internet users there are,

21    and I don't know how many they were in 1999 -- unless you have a

22    great mass of people, it doesn't work.

23         MR. DANIELS:  Yes.  And, in fact, that -- that

24    reference to the great masses appears in the specification.

25         THE COURT:  Oh, okay.  I was looking at it two hours

1    ago, maybe subconsciously it got into my head here.

2         MR. DANIELS:  Yet in Column 4, Line 42, because of the

3    massive numbers of buyers and sellers.

4         THE COURT:  All right.

5         I see it or maybe you said it in your brief?

6         MR. DANIELS:  I don't think we did, your Honor.

7         THE COURT:  Okay.  All right.

8         I think I got your point.

9         Is there anything else that you want to tell me?

10        MR. DANIELS:  Well, I know that you are familiar with

11   the case law, and we have excerpts from the case law on Pages 4

12   and 5 of our brief, that I think attempt to do that balance of

13   figuring out which is eligible, and which is not eligible, but I

14   won't read through them, and just -- but recommend them to you.

15        THE COURT:  All right.

16        I'm just curious, do either party -- you know, there

17   was kind of a flurry of these mostly District Court decisions a

18   couple of weeks back, and I haven't actually seen any more

19   coming out since, but I haven't really been looking for them

20   either -- since the briefs were written, and the last one is not

21   very long ago, October 2, 2014, so three weeks ago plus, are

22   there any more relevant decisions in the last three weeks that

23   either party is aware of and wants to tell me about?

24        MR. DANIELS:  We're not aware of any, your Honor.

25        THE COURT:  Mr. Swanson?

1          MR. SWANSON:  There is at least one that I think came

2    out at the very end of September, that at least I was aware of.

3          THE COURT:  What is it?

4          MR. SWANSON:  It's Cogent Medicine case in the Northern

5    District of California.  Judge White.

6          THE COURT:  Cogent?

7          MR. SWANSON:  C-O-G-E-N-T Medicine.  2014, Westlaw

8    4966326.

9          THE COURT:  4966326?

10         MR. SWANSON:  Correct.

11         THE COURT:  That's from the Northern District at the

12   end of September, okay.

13         MR. DANIELS:  Your Honor?

14         THE COURT:  Yes?

15         MR. DANIELS:  Your Honor, there is a case from the

16   Northern District of Illinois now.  The name escapes me.  I have

17   it and I can send you the citation.  It's --

18         THE COURT:  In the last month or so?

19         MR. DANIELS:  Yes.

20         THE COURT:  Is this Judge Fullerman?

21         MR. DANIELS:  It's -- I just don't remember.  It was

22   favorable to the patentee.

23         THE COURT:  Maybe you could, when you get back to your

24   office, just send me a one-sentence letter saying the case I

25   cited referred to was such-and-such, and then we'll have that,

1    too.

2          THE COURT:  Is there anything more that you want to

3    say, Mr. Daniels?

4          MR. DANIELS:  No, there is not.

5          THE COURT:  Mr. Swanson, do you want to take a couple

6    minutes, more than a couple minutes to respond?

7          MR. SWANSON:  Sure, your Honor.  I'll try to be brief.

8          THE COURT:  What do you say to Mr. Daniels' exemplary

9    Claim No. 1, with all these limitations, merely telescoping down

10   the method that is claimed here, does that meet the second step

11   of the Alice analysis?

12         MR. SWANSON:  It does not.  The limitations that

13   counsel identified, and that are bolded in Slide 1, these are --

14   they're not inventive, they're not meaningful limitations on an

15   abstract idea.

16         All of these are related to abstract intangible notions

17   about human relations.  These are not the types of limitations

18   that Alice was looking at to find an inventive concept, or

19   other Courts have looked at.

20         Alice was focused on the second step about, is the use

21   of a computer unconventional or is there some innovative use of

22   a computer?  Is there improvement in computing technology?

23         The Court wasn't looking at, is this some unique way of

24   doing an intermediate settlement that hasn't been done before?

25         That is not what the Supreme Court was focused on.

1        THE COURT:  Well, so, doesn't that help Mr. Daniels,

2    because this issue hasn't been decided already?

3        MR. SWANSON:  I don't think it does.  I think relying

4    on these type of limitations is not what the Supreme Court has

5    in mind on the inventive concept step of the test.

6        The argument that I heard counsel make is that these

7    limitations take the abstract idea, and they narrow it in such a

8    way, so that the doesn't preempt all uses of the abstract idea.

9        THE COURT:  Well, you would agree that if you take all

10   these limitations, it is an incredibly narrow set of

11   circumstances, isn't it?

12       MR. SWANSON:  I don't know that I would agree that it's

13   all that narrow.

14       I do agree it's narrower than at least their

15   formulation of the abstract idea.

16       THE COURT:  So let me ask, what does AOL do that could

17   arguably be selling things based on a game associated with the

18   thing being sold?

19       MR. SWANSON:  I don't think we do this.  I think we

20   probably have to ask the plaintiff what they alleged that --

21       THE COURT:  Well, I was just thinking that you are

22   saying it's a great broad idea.  I assume AOL must either host,

23   or I don't know that, but I was just curious, because it does

24   seem, you know, in my forays on the internet of buying things,

25   I've never seen anything like this.

1          MR. SWANSON:   Again, I don't think we practiced this.

2          THE COURT:   Okay.  So, let's not talk about you, let's

3    throw someone else under the bus.

4          Have you ever seen anything like this on the internet?

5          You can ask your colleagues, or both your colleagues.

6          MR. SWANSON:   Well --

7          THE COURT:   I won't ask your client.

8          MR. SWANSON:   To address the associated limitation,

9    because that was -- counsel used that to distinguish the Babe

10   Ruth example.

11         And the restaurant example that I gave earlier, is an

12   example where the activity, the competitive activity, or

13   intermediary activity is associated with the product.   There,

14   you're trying to eat your food.

15         THE COURT:   I gave the restaurant example.

16         MR. SWANSON:   You gave the example about the millionth.

17   Customer.   I had the example about the steakhouse you go to

18   where --

19         THE COURT:   Yes, okay.  Sorry.  I'm not trying to take

20   credit for your stuff there.   Okay.

21         MR. SWANSON:   And that's an example where the activity,

22   the eating, is exactly tied to the product or service that you

23   are buying from the restaurant.

24         THE COURT:   Okay.  I'm just trying to think of -- wait,

25   wait.

1          Okay.  All right.

2          I'm sorry.  So why don't you give me your best two

3   minutes and then we'll call it a day.

4          MR. SWANSON:  Sure.  I really want to make it clear

5   that I think the plaintiff's preemption argument is misguided

6   under the law.  The notion that we're not -- the claims are not

7   preempting all the e-commerce because they're all so narrow.

8          The patentee in the OIP Technologies case that I

9   mentioned earlier -- and I'll give you the cites, I not sure if

10  I did --  is 2012 WestLaw 3985118.

11         The patentee made a similar argument and said, our

12  e-commerce patent doesn't preempt all ways of doing price

13  optimization.  Only the specific claim waived does the price

14  optimization.

15         And the Court said, that's wrong.

16         The Court's said -- and I quote -- "A patent need not

17  wholly preempt the abstract idea of price optimization in all of

18  its forms in order to be ineligible under Section 101.  Rather,

19  the degree of preemption relevant to the Section 101 analysis is

20  a relative concept."

21         That was on Page 20.

22         And what the Court there means is, the Court is

23  referring to the discussion in Mayo that preemption is relative,

24  and that you've got to look at what the inventor's contribution

25  is relative to the scope of the right to exclude.  And where the

1   inventor hasn't contributed anything to the body of the science

2   and technology, then the inventor shouldn't have any right to

3   exclude even a narrow portion an abstract idea.

4        And that principle has been applied in a number of

5   cases.  Judge Stark in the Walker Digital case said,

6   essentially, the same thing.

7        And said, "These types of limitations that just narrow

8   the abstract idea into a narrower, but still abstract and still

9   familiar idea about human behavior is not enough."

10        I would also refer the Court to the buySAFE case, the

11   precedential Federal Circuit case that came out after Alice,

12   where the Court said, "The abstract idea was a transaction

13   performance guarantee, and some of the dependent claims narrowed

14   it to different types of contractual relations."

15        And the Federal Circuit said, "That's not the type of

16   narrowing that's germane here."

17        Just briefly, I just wanted to address the auction

18   arguments.  There were a lot of references to auctions.

19        The auction here is a field of use limitation which is

20   not enough.

21        THE COURT:  I heard you say that the first time.

22        MR. SWANSON:  In Bilski, okay.

23        Counsel's argument on the internet, somehow making this

24   a more practical or better --

25        THE COURT:  I think the word you would use would be

1  feasible.

2        MR. SWANSON:  Feasible, abstract idea.

3        I would actually note that the patents, themselves,

4  Column 4, Line 38, say that the price determining activity may

5  be conducted, quote, "online or offline."

6        And then the next sentence says that, "Application of

7  the present invention is specially beneficial using a global

8  communications network such as the internet."

9        So, the patents, themselves, say this could be done

10  offline, and that the internet is simply one application.

11  Clearly, the same concept can be practiced, and in the example

12  of Babe Ruth, or the restaurant, it has be done without the use

13  of computers or technology.

14        THE COURT:  All right.

15        Thank you, Mr. Swanson.

16        Mr. Daniels, I'm just curious, and you don't have to

17  tell me for AOL, but the kind of auction and competitive games

18  that are described in the exemplary claims that we've been

19  talking about, can you give me an example of who actually does

20  that?  You know, something I might be familiar with?

21        MR. DANIELS:  The accused activity in this case by AOL,

22  and the other defendants, is that type of activity.  I don't

23  think you would be aware of it, because it's -- it's for vendors

24  who want to add space on the internet.  I don't know --

25        THE COURT:  Do vendors play games to ad space?

1          MR. DANIELS:  Yes, they do.  They have a competitive

2     activity.

3          THE COURT:  What is the competitive activity?

4          MR. DANIELS:  The competitive activity attract the

5     maximum number of hits on to their web page.

6          THE COURT:  Okay.  That would be associated with --

7     okay.  All right.

8               That makes sense.

9          MR. DANIELS:  Thank you.

10         THE COURT:  So you have one point that you want to

11    make?

12         MR. DANIELS:  Yes, your Honor.  It is that although

13    Column 4, our specification says you can do it online or

14    offline, are claims, themselves, which should be what rules says

15    it's done on a network, and --

16         THE COURT:  Well, that is a fair point.

17         MR. DANIELS:  May I say one more thing?

18         THE COURT:  All right.

19              Since you -- we'll do this like challenging a play in a

20    football game.  You got that one right.  You can have another

21    one.

22         MR. DANIELS:  Thank you, your Honor.

23         THE COURT:  This is kind of like a competitive

24    activity.

25              Go ahead.

1          MR. DANIELS:  The OIP Technologies case sounds to me

2     like it's contrary to the holding of Alice and not taking into

3     account fully, the preemption here.  And I point out that from

4     the case cite given to us by AOL, it's a 2012 case, and not one

5     that had the benefit of Alice.

6          THE COURT:  And even though it tends to be, and people

7     certainly seem to be thinking that Amazon moved the ball -- not

8     Amazon -- Alice moved the ball away from where you want to be,

9     not toward where you want to be, so that the number of decisions

10    declared unpatentable before Alice seems to have been a lot

11    fewer since the recent post-Alice activity.

12          But I understand your point.  You have to pay attention

13    to what the Supreme Court has said and I will endeavor to do

14    that.

15          MR. DANIELS:  Thank you.

16          THE COURT:  All right.

17          Thank you, Mr. Daniels.  Thank you, Mr. Swanson.

18          I'll take this under advisement.

19          It's an interesting issue, so I thank you for your

20    presentation, okay.

21          MR. DANIELS:  Thank, your Honor.

22          MR. SWANSON:  Thank you, your Honor.

23          THE COURT:  All right.

24          We'll stand-in recess.

25          (The proceedings adjourned at 4:33 o'clock p.m.)

1                               *   *   *   *   *
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25